# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RONALD LEE WEISS,                  )
                                   )
                 Petitioner,       )        2:02-cv-01566
                                   )
         v.                        )        Judge Mark R. Hornak
                                   )
JOHN WETZEL, et al.,               )
                                   )
                 Respondents.      )

## OPINION

**Mark R. Hornak, United States District Judge**

Barbara Ellen Bruzda (the "Ms. Bruzda") was sixteen years old when she disappeared on the evening of October 23, 1978. Her body was found five months later, on March 20, 1979, by hikers in a remote area of Indiana County, Pennsylvania. Ms. Bruzda had been with the Petitioner, Ronald Lee Weiss ("Weiss"), on the night she disappeared. Her family and the police always considered Weiss a suspect in her murder, but for eighteen years the Commonwealth believed that it did not have enough evidence to bring him to trial. That changed in 1997, by which time the Commonwealth had obtained the cooperation of two jailhouse informants, Samuel Tribuiani and Kermeth Wright, who each claimed that Weiss had confessed to him years earlier.[1] The Commonwealth charged Weiss with Ms. Bruzda's murder and a three-day capital murder trial was held in the Court of Common Pleas of Indiana County (PA) July 7 through July 9, 1997. The jury found Weiss guilty of first-degree murder.[2]

---

[1] Wright said Weiss confessed to him when they were in the same prison in 1985. Tribuiani, who was incarcerated with Weiss in 1993, said Weiss confessed to him in that year.

[2] The Commonwealth sought the imposition of the death penalty, and at the conclusion of the penalty hearing held on July 10, 1997, the jury returned a verdict of death. The state trial court vacated that sentence in 2014 and Weiss was then resentenced to a term of life imprisonment without the possibility of parole.

The Pennsylvania Supreme Court affirmed Weiss's judgment of sentence in 2001. *Commonwealth v. Weiss*, 776 A.2d 958 (Pa. 2001) ("*Weiss I*"). Weiss then pursued collateral relief in state court under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 *et seq.* In 2007, the PCRA court found that the Commonwealth violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963) because it suppressed evidence that both Tribuiani and Wright had asked for, and had been provided with, prosecutorial assistance in their efforts to get released from state prison. The PCRA court granted Weiss a new trial, but the Pennsylvania Supreme Court vacated that decision and remanded for further analysis as to *Brady*'s materiality component. *Commonwealth v. Weiss*, 986 A.2d 808 (Pa. 2009) ("*Weiss II*"). The PCRA court on remand denied Weiss relief in 2012, and the following year the Pennsylvania Supreme Court affirmed, concluding that the suppressed evidence was not material for *Brady* purposes. *Commonwealth v. Weiss*, 81 A.3d 767 (Pa. 2013) ("*Weiss III*").

In his amended federal petition for a writ of habeas corpus, ECF No. 39, which he filed pursuant to 28 U.S.C. § 2254, Weiss claims that the Commonwealth violated his *Brady* rights because it suppressed valuable impeachment evidence that Tribuiani and Wright had asked for and had received favorable prosecutorial consideration in exchange for their testimony, and because prosecutors knowingly introduced false testimony that Tribuiani and Wright had not so asked, and the Commonwealth had not so reciprocated. The Court agrees. In its prosecution of Weiss for Ms. Bruzda's long-unsolved murder, the Commonwealth engaged in a pattern of prosecutorial misconduct that resulted in a fundamentally unfair trial.

## I. Background

### A. Ms. Bruzda's 1978 Disappearance and Weiss's 1997 Arrest for Her Murder

The Bruzda family owned a tavern and Weiss and Ms. Bruzda played pool there together on the day she disappeared. Trial Tr., 7/8/97, at 374–75. Her mother, Roxie Bruzda, saw her leave the tavern about five minutes after Weiss, sometime between 6:00 p.m. and 7:00 p.m. *Id.* at 377. That was the last time Roxie Bruzda saw her daughter alive. She immediately suspected that Weiss was involved in Ms. Bruzda's disappearance, and on October 25, 1978, she called and then confronted him at his mother's house. *Id.* at 379–81. Weiss told her that after he had left the tavern, he had encountered Ms. Bruzda walking up the road with a young man dressed in dark clothing. He gave them a ride to Clarksburg, where they hitched a ride with someone driving a black pickup truck. *Id.* at 380–81. Weiss informed Roxie Bruzda that Ms. Bruzda had told him that she was running away. *Id.* Weiss repeated a similar story to police investigators who questioned him that day, *id.* at 454–55, and over the course of the next several months. *Id.* at 457, 465, 468. He did not tell Roxie Bruzda or the police that he had attended a party with Ms. Bruzda on the night of her disappearance.

When the hikers found Ms. Bruzda's body five months later, "it was wrapped in a distinctive, homemade red and white quilt." *Weiss III*, 81 A.3d at 775. The forensic pathologist who testified at Weiss's trial estimated that Ms. Bruzda had been dead between three to six months, Trial Tr., 7/8/97, at 439, and that she died from "massive skull fractures with associated . . . brain injury." *Id.* at 437. The injuries she sustained, he testified, were caused by someone hitting her with "something rounded, like a club or a pipe or…a tire iron or pry bar." *Id.* at 445.[3]

---

[3] Aside from the quilt itself, there was no other physical evidence purportedly linking Ms. Bruzda to her murderer. Investigators did not find any type of weapon in the vicinity of her body nor observe any footprints. Trial Tr., 7/8/97, at 429–30. They did find six empty beer cans nearby, but they yielded no fingerprints. *Id.* at 430.

3

Weiss remained a suspect in Ms. Bruzda's murder, and the police eventually learned that he attended a party with her on the night she disappeared. *Weiss III*, 81 A.3d 775. But no significant break came in the case until more than six years after Ms. Bruzda was first reported missing. In May 1985, Weiss's ex-wife, Sharon Pearson, told the police that she cleaned blood out of the back of Weiss's car (a Buick) the day after Ms. Bruzda disappeared, and that the quilt in which Ms. Bruzda's body had been found belonged to her and Weiss.[4] *Id.*

The police arrested Weiss the week after Pearson made her report and charged him with Ms. Bruzda's murder. However, the Commonwealth "*nolle prossed* the charges in 1987, when the trial court determined that [Pearson] was incompetent to testify due to spousal privilege." *Id.* (citing 42 Pa. Cons. Stat. § 5913 (1987)).

The state spousal privilege statute "was amended in 1989 to permit spousal testimony in cases of homicide," and, as a result, the Commonwealth then was no longer barred from presenting Pearson's testimony in a prosecution of Weiss. *Id.* Nevertheless, the Commonwealth did not then file new charges against Weiss. In 1993, an investigative grand jury was empaneled but it did not return an indictment. *Id.* at 776. By March 1995, an assistant deputy with the Commonwealth's Attorney General's Office informed police investigators that "although a circumstantial case did exist against [Weiss] he felt insufficient evidence existed to successfully prosecute [him] at this time." ECF No. 39-1, at 49.

That assessment changed by early 1997. That is because by then Pennsylvania State Police Trooper John R. Tamewitz had obtained signed statements from Tribuiani and Wright in which they each claimed that Weiss had confessed to each of them, albeit years earlier. Armed with this

---

[4] The PCRA noted in its 2012 opinion that "[b]y the time Pearson did divulge what she knew about the quilt and the blood she had found in the car, the Buick was long gone." ECF No. 39-1, at 38.

4

new evidence, the Commonwealth arrested Weiss in February 1997 and charged him with Ms. Bruzda's murder. PCRA Hr'g Tr., 3/30/07 at 90–91.

Attorneys with the Indiana County Public Defender's Office represented Weiss, including Assistant Public Defender Robert S. Dougherty, Esq. ("Defense Counsel"). Deputy Attorney General J. Scott Robinette, Esq., (the "Prosecutor") prosecuted the case.

Tribuiani and Wright had lengthy criminal records and they both were incarcerated at the time Trooper Tamewitz interviewed them.[5] Defense Counsel testified at a PCRA hearing that he "didn't believe for one second" that they did not have deals with the Commonwealth, but the Prosecutor repeatedly assured him there were none. PCRA Hr'g Tr., 3/29/07, at 30.

The defense filed a pre-trial motion for discovery requesting that the trial court order "that the Commonwealth disclose any and all consideration or promises of consideration given to or made on behalf of the Commonwealth witnesses." ECF No. 39-3, at 75. The trial court granted this motion[6] and at the pre-trial hearing the Prosecutor told the trial court and Defense Counsel that the Commonwealth had no deals with any potential witnesses, stating: "Deals, we don't have any deals with them, Judge," to which the Judge responded: "The motion is granted and the answer is that there are no deals or consideration." Hr'g Tr., 5/16/97, at 9.[7]

---

[5] On March 4, 1991, Tribuiani, who had been convicted of multiple counts of burglary, was sentenced in the Court of Common Pleas of Montgomery County (PA) to a term of seven to fifteen years in prison, to be followed by ten years of probation. He was incarcerated at SCI-Huntingdon when he gave his signed statement to Trooper Tamewitz on April 2, 1996.

On August 20, 1985, Wright, who had been convicted of robbery, burglary, and attempted theft while possessing a firearm, was sentenced in the Court of Common Pleas of Indiana County (PA) to a term of five to ten years in prison. He was incarcerated at SCI-Cresson when Trooper Tamewitz first interviewed him on December 7, 1995. He would not sign his statement until he spoke with his wife. On January 16, 1996, Trooper Tamewitz visited Wright again and Wright agreed to sign his statement.

[6] The trial judge had directed the Prosecutor to make complete pretrial disclosures, and stated that "we don't have any secrets here today." Hr'g Tr., 5/16/97 at 4; PCRA Hr'g Tr., 3/30/07, at 55.

[7] Thereafter, the Prosecutor told the trial judge that the prosecution would "honestly report the level and extent of their cooperation and tell the truth about what they do . . ." *Id.* at 10. Of course, as is noted below, this fundamentally

5

On May 20, 1997, the Prosecutor sent the following written response to the defense's discovery motion:

> The purpose of this letter is to comply with [the trial court's] order of May 16, 1997, directing the Commonwealth to notify you of any deals or understandings between the Commonwealth and potential witnesses Kerm Wright and Samuel Tribuiani.
>
> The Commonwealth has not threatened these witnesses in order to secure their cooperation, *nor have the witnesses been promised anything in exchange for their testimony.* However, the witnesses have been informed that the Commonwealth will take reasonable steps to protect their safety. The Commonwealth has also informed these witnesses that the Commonwealth will accurately report the nature and extent of their cooperation whenever queried regarding the same.

ECF No. 39-3, at 87 (emphasis added).

By the time of his arrest, Weiss's story had changed significantly from the one he had told to Roxie Bruzda and the police in the days and months that followed Ms. Bruzda's disappearance. He continued to maintain that he did not kill Ms. Bruzda, but now he said he knew who did: Pearson's brothers, Larry and Gary Priest (collectively, the "Priest brothers"). Weiss told his sister, Jean Hatmaker, that on the night Ms. Bruzda disappeared the Priest brothers tried to kill him so that Pearson could collect on his $25,000 life insurance. They killed Ms. Bruzda, Weiss told his sister, because she witnessed their brutal assault of him. Trial Tr., 7/8/97, at 499–501. Weiss gave a similar account to an acquaintance, Jo Ann Best. He also informed her: "I haven't ever told anyone about who did kill that girl until now, because both Larry and Gary stated that if I ever said anything about it, they would kill my mother and dad and my kids . . . ." *Id.* at 530.

---

misrepresented what was asked for by the witnesses, and what was affirmatively done by the Prosecutor and Trooper Tamewitz.

## B. Weiss's July 1997 Trial

Weiss's trial commenced on July 7, 1997. The Commonwealth presented testimony from several witnesses to establish that on the day Ms. Bruzda disappeared, she and Weiss had been together first at the Bruzda family's tavern and then at a party held at Henry Hobart's house. *Weiss III*, 81 A.3d at 776. Hobart testified that before Weiss left his house, Hobart lent him a tire iron. Trial Tr., 7/8/97, at 491–92. But then on cross-examination, Hobart explained that in actuality he lent the tire iron to either Weiss or to another man named Alan Stiles. *Id.* at 493–94.

Ernest Sachweh, who was married to Weiss's sister in 1978, testified that he was with Weiss on one of the occasions when Roxie Bruzda confronted him. *Id.* at 592. Weiss told her that he did not know what happened to Ms. Bruzda. After she left, Weiss said to Sachweh "that he wished that bitch would quit bugging him about her daughter." *Id.* Weiss then asked Sachweh to call Roxie Bruzda and falsely report that Sachweh saw Ms. Bruzda with her boyfriend and that "she was doing fine and wanted to be left alone." *Id.* Sachweh refused. *Id.*

The Commonwealth presented the testimony of Hatmaker and Best to establish that after he was arrested, Weiss's story changed and he blamed Ms. Bruzda's murder on the Priest brothers. *Weiss III*, 81 A.3d at 776–77. Although Weiss claimed that they beat him so badly on October 23, 1978, that they thought that they had killed him too, several of the Commonwealth's witnesses testified that they saw Weiss in the days following Ms. Bruzda's disappearance and he had no injuries. *Id.* at 777.

Pearson testified that Weiss drove their Buick on October 23, 1978, and that he returned to their home around midnight. Trial Tr., 7/8/97, at 507. She said that he did not have any injuries that would indicate that he had been beaten that evening. *Id.* at 507–08. The next day, when she was cleaning out the Buick, Pearson saw "[a] lot" of blood smeared on the back of the front seats,

the back seat, and the interior roof. *Id.* at 509.[8] When she asked Weiss where the blood had come from, he showed her "one little scuff mark on his knuckle" that "didn't even look like it bled." *Id.* at 515, 522. After cleaning the car, Pearson noticed that the quilt that had been covering the back seat was missing. *Id.* at 509.

The Prosecutor showed Pearson the quilt that had been wrapped around Ms. Bruzda's body, and she identified it as the same one that been in the Buick prior to Ms. Bruzda's disappearance. *Id.* at 509–10. Pearson testified that there was no doubt in her mind about that identification of the quilt and that she was "absolutely positive." *Id.* at 510, 515. She also said that she never asked her brothers to kill Weiss and that she had no knowledge of any life insurance policy. *Id.* at 513–14. She said that Weiss "was getting S.S.I. I was on public assistance. We had a medical card. We couldn't afford insurance." *Id.* at 514.

To buttress Pearson's testimony, the Commonwealth called Weiss's niece, Sandra Spence-Neigh, who recounted the following conversation she had with Pearson in late October 1978:

> [Pearson] said that when [Weiss] came home, there was blood in the back seat of the car. And I asked her how the blood got there, and she said, "Well, he said he cut his hand." And I said, "Blood in the back seat of the car and he cut his hand?" And she said–or I said, "Just like a spot of blood?" She said, No, there was blood on the seat, on the front of–the back of the front seat and on the windows.

Trial Tr., 7/8/97, at 552. But on cross examination, Spence-Neigh admitted that in December 1979 she had told an investigating officer that Pearson had instead told her that there was only "a spot of blood on the back seat of the car." *Id.* at 554.

---

[8] Pearson also testified that shortly after October 23, 1978, she and Weiss stopped driving the Buick. Trial Tr., 7/8/97, at 511. She was not aware of any problems with it, but Weiss had told her that its timing chain had broken. *Id.* They parked it on Weiss's parents's property along with other junk cars that were in the process of being stripped for parts. *Id.* At some point the following spring, Pearson said, Weiss had the Buick and several other cars removed from the property, although other junk vehicles remained. *Id.* at 512–13.

Wright testified that he asked Weiss in 1985 if he killed Ms. Bruzda and Weiss replied: "Yes, I did it." *Id.* at 532. Tribuiani testified that Weiss admitted to him in 1993 that he murdered "[a] young girl" "a lot of years ago, approximately 15, 20 years back." *Id.* at 556. Weiss "[s]aid that he and a friend of his wacked her" on the head "with a bar and an ax" "like a hatchet." *Id.* at 557. Tribuiani testified that Weiss said he killed the girl because "she was going to tell on their sex parties and they were in some kind of weed business." *Id.*

The Prosecutor elicited testimony from Tribuiani that no one had made any promises to him in exchange for his testimony. *Id.* at 558. Trooper Tamewitz confirmed in his sworn trial testimony that he did not offer Tribuiani anything in exchange for his statement. *Id.* at 564. Wright likewise testified under oath that no promises had been made to him in exchange for his testimony. *Id.* at 533. He said that he was testifying because Weiss's confession had "been haunting" him "since 1985." *Id.* at 544.

Weiss then testified in his own defense. He denied that he confessed to Tribuiani and Wright. Trial Tr., 7/9/97, at 640–44. He also gave a description of events that the PCRA court in 2012 described as "[t]he most damaging evidence" introduced at the trial. ECF No. 39-1, at 22. Weiss acknowledged that he drove Ms. Bruzda to Hobart's party the evening that she disappeared, but he said that they did not know each other and he only agreed to take her because she had asked him to and he needed to speak with Hobart anyway. Trial Tr., 7/9/97, at 619–20. Weiss said he left the party on his own, but when he walked out to his car Ms. Bruzda was waiting by it and asked him for a ride back to Tunnelton. *Id.* at 622. He testified that when they were driving on a remote road, two vehicles driven by the Priest brothers intercepted and blocked his car. *Id.* at 623. Weiss said they pulled him out of the car, beat him with a club, and left him for dead in a ditch. *Id.* at

623–24. When he regained consciousness, he crawled back to his car and drove to his mother's house. *Id.* at 624–25.

Weiss told the jury that his "head was split open" and bleeding from the assault, *id.* at 625, and that is why Pearson observed blood in the car the next day. *Id.* at 637. After his mother tended to his injuries and cleaned his head "where is was busted open," *id.* at 625, he returned home to Pearson. *Id.* at 626. Weiss said that he was at the mall the next day when Larry Priest confronted him in the parking lot and told him that he would kill him, his parents, and his kids if Weiss ever reported what happened. *Id.* at 628–29. That is why, Weiss told the jury, he did not tell the truth about what happened for so many years. *Id.* at 631, 634. Weiss also testified that he did not remember keeping a quilt in his car and that the quilt that Pearson had identified was Gary Priest's. *Id.* at 637.

During cross examination, Weiss said that he would not do something like take a crowbar or tire iron and strike someone in the head with it. *Id.* at 680. To rebut that statement, the court permitted the Commonwealth to call David Townsend. The state trial court had not allowed the Commonwealth to call Townsend as part of its case-in-chief because he had not been listed as a potential witness. *Id.* at 599. Townsend testified that he once saw Weiss strike a man in the head with a tire iron, and that afterward Weiss threatened him that if he "didn't keep [his] mouth shut" he "would end up just like" Ms. Bruzda. *Id.* at 696–97. Townsend also said that in 1989 Weiss told him that he had killed a girl named Barb. *Id.* at 695.

On July 9, 1997, the jury convicted Weiss of first-degree murder. A capital sentencing hearing was held the next day, and at its conclusion the jury announced a verdict of death. After the Pennsylvania Supreme Court affirmed Weiss's judgment of sentence in 2001, Weiss filed with this Court his original petition for a writ of habeas corpus. ECF No. 8. It was a "mixed petition,"

meaning that it contained both exhausted and unexhausted claims, and in May 2003 this case was stayed while Weiss pursued his PCRA remedies in state court. ECF No. 12.

## C. Weiss's PCRA Proceeding

Weiss raised numerous claims in his PCRA proceeding, including that the Commonwealth violated *Brady* because it suppressed information that Tribuiani and Wright had sought and had received benefits in exchange for their testimony, and that the Prosecutor had knowingly presented false testimony that they had not. The judge that had presided over Weiss's trial had retired and, therefore, a new judge was assigned to his PCRA proceeding.

A *Brady* violation occurs when the government (1) knowingly presents or fails to correct false testimony; (2) fails to provide requested exculpatory evidence; or (3) fails to volunteer exculpatory evidence never requested. *Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 149 (3d Cir. 2017) (citing *United States v. Agurs*, 427 U.S. 97 (1976), holding modified by *United States v. Bagley*, 473 U.S. 667 (1985)). Where the claim is one of suppressed evidence, the nondisclosed evidence is material "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Dennis v. Sec'y, Pa. Dept. of Corr.*, 834 F.3d 263, 309 (3d Cir. 2016) (en banc) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995), which quoted Justice Blackmun's opinion in *Bagley*).

> The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434, 115 S. Ct. 1555. Materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . [Rather], [a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted).

*Id.* (alterations made by the Court of Appeals).

A different and more defense-friendly standard of materiality applies when the prosecutor knowingly uses false testimony, or fails to correct false testimony. Where either of those events has happened, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Haskell*, 866 F.3d at 149 (quoting *Agurs*, 427 U.S. at 103); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959).[9]

### 1. The Suppressed Evidence Regarding the Deal with Tribuiani

The PCRA court held evidentiary hearings on Weiss's guilt-phase claims on March 29 and 30, 2007, at which ten (10) witnesses testified, including Defense Counsel, the Prosecutor, and Trooper Tamewitz.

Weiss introduced evidence to establish that Tribuiani, who was incarcerated at SCI-Huntingdon when he gave his statement to Trooper Tamewitz on April 2, 1996, requested consideration within days of giving it. The Prosecutor documented Tribuiani's request in a memorandum to the file dated April 8, 1996, in which he wrote:

> Initially, Tribuiani requested nothing in exchange for his cooperation and testimony. *He later contacted Trooper Tamowitz [sic] and requested that Tamowitz [sic] assist in expediting his parole from S.C.I. Huntingdon.* Apparently, Tribuiani's son will be released from a drug and alcohol rehabilitation program shortly, and Tribuiani desires expedited parole so that he may parent his son upon release. Tribuiani apparently has already been approved for parole by the State Board of Probation and Parole and the processing of certain paperwork currently is holding up his release.
> . . .
> Following the discussion about this matter with S.D.A.G. von Geis, *I will contact the superintendent at S.C.I. Huntingdon to inquire about the possibility of expediting the parole of Tribuiani.*

ECF No. 39-3, at 47 (emphasis added).

---

[9] Our Court of Appeals's decision in *Haskell* also resolved that in the Third Circuit, the actual-prejudice standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), does not apply when the state knowingly presents or fails to correct false testimony. 866 F.3d at 147–52.

The Prosecutor suspected that Tribuiani was not eligible for parole because he had not yet served his minimum sentence (which would not expire until October 1997). PCRA Hr'g Tr., 3/30/07, at 20–21. On April 8, 1996, the same day he wrote the above-quoted memorandum, the Prosecutor called the Superintendent of SCI-Huntingdon to see if what had been relayed to him "was accurate and maybe there's a piece of paper sitting on this desk that some bureaucratic official hasn't moved to another pile." *Id.* at 22.

The Prosecutor learned from that telephone call that Tribuiani was being considered for early release to a halfway house, not for parole. ECF No. 39-3, at 62. To assist Tribuiani in getting approved for an early release, Trooper Tamewitz telephoned the Pennsylvania Department of Corrections and according to that Department's records, advised it that Tribuiani "has the full explicit support of the PSP." ECF No. 39-3, at 49.[10] To assist Tribuiani further, on April 9, 1996, the Prosecutor wrote three letters on Tribuiani's behalf: one to Tribuiani's sentencing judge, ECF No. 39-3, at 53–54, one to the Victim-Witness Coordinator of Montgomery County, ECF No. 39-3, at 56–57, and one to the District Attorney of Montgomery County, ECF No. 39-3, at 59–60. In each letter, the Prosecutor wrote:

> It is . . . my understanding that Tribuiani is being considered by the Department of Corrections for pre-release to a half-way house, though his minimum sentence will not expire until October of 1997. As you know, the Department of Corrections routinely seeks input from the trial court, prosecutor and the victim-witness coordinator when evaluating the propriety of such pre-release from a state sentence.
>
> The purpose of this letter is to inform you that Tribuiani has offered to testify on behalf of the Commonwealth in an 18-year-old homicide case being prosecuted by this Office. A former cell mate of Tribuiani's is the primary suspect in the 1978 murder of a 16-year-old girl. It appears that Tribuiani's testimony could significantly assist the Commonwealth in obtaining a conviction in this case.

---

[10] Trooper Tamewitz testified that he would not have used those words when he interceded on behalf of Tribuiani. PCRA Hr'g Tr., 3/30/07, at 123.

> As a prosecutor, I have myself responded where appropriate in vigorous opposition to proposals for the pre-release of state prisoners. However, in this case, *I am asking you to please consider Tribuiani's valuable cooperation with this Office when and if you register any response to the Department of Corrections' proposal for pre-release from his sentence.*

ECF No. 39-3, at 53, 56, 59 (emphasis added).

Trooper Tamewitz also called the District Attorney of Montgomery County (PA) on April 19, 1996.[11] Several days later, the District Attorney spoke to the Prosecutor and advised him that his office "would co-operate to help their prosecution." ECF No. 39-3, at 68. Likewise, on May 1, 1996, the Victim-Witness Coordinator wrote to the Prosecutor and informed him that "we have no opposition to Mr. Tribuiani being released to a half-way house as part of his prerelease program," and she hoped "this leads to the testimony needed to get a conviction in the 1978 murder case." ECF No. 39-3, at 71. On July 5, 1996, Tribuiani was released to a half-way house.

In June 1997, about one month before Weiss's trial (and nearly a year after Tribuiani received his desired early release), Tribuiani violated his release conditions and had to return to prison.[12] In the months following Weiss's trial, the Prosecutor wrote letters to the Chairman of the Pennsylvania Board of Probation and Parole (the "Parole Board") and the Superintendent of SCI-Graterford in which he requested that they take into consideration Tribuiani's contribution to the Weiss prosecution when he was considered for parole. ECF No. 39-3, at 98–99; ECF No. 39-4, at 10–11. In 1998, Tribuiani's request for parole was denied.

---

[11] Trooper Tamewitz testified that he did not record Tribuiani's requests for assistance, nor his efforts on behalf of Tribuiani, in his official reports, PCRA Hr'g Tr., 3/30/07, at 123, 143, even in circumstances when he documented the balance of his contacts with Tribuiani. *Id.* at 149. He took a similar approach as to his dealings with Wright. *Id.* at 158–160.

[12] At this point, Tribuiani was calling Trooper Tamewitz daily asking the Trooper to "get him out." PCRA Hr'g Tr., 3/30/07, at 126.

Angered by this, on October 25, 1998, Tribuiani wrote a letter to the Prosecutor threatening that he would expose their "secret about the Weiss case and my participation in it" if did not receive parole. ECF No. 39-4, at 16. Tribuiani went on to state in that letter: "If you recall our meeting at the County Prison along with Trooper John Tamewitz you + he, both stated, that "We can't do anything about your imprisonment now because of the trial. However after the trial we'll get on it + get you out"." *Id.* (emphasis in original).

There is no dispute that the Prosecutor did not disclose to the defense team that Tribuiani had asked for assistance in getting an early release, and that Trooper Tamewitz and the Prosecutor had affirmatively and repeatedly provided him with the very assistance that they had promised to him.

## 2. The Suppressed Evidence Regarding the Deal with Wright

Weiss also introduced evidence to establish that Wright had asked for and had received prosecutorial consideration in exchange for his cooperation. Wright first reported to Trooper Jeffrey Witmer that he knew that Weiss killed Ms. Bruzda. Wright told this to Trooper Witmer on July 11, 1995, during an interview that was conducted at Wright's home about unrelated matters. Trial Tr., 7/8/97, at 545–48; ECF No. 39-1, at 55. Trooper Witmer recorded in his police report that Wright also told him: "I'll never tell, I don't squeal." ECF No. 39-1, at 55.

But when Trooper Tamewitz interviewed Wright on December 7, 1995, Wright was back in prison at SCI-Cresson. On January 16, 1996, Wright provided to Trooper Tamewitz a signed statement that Weiss had confessed to him. ECF No. 39-1, at 56–64.

The Prosecutor admitted at the PCRA hearing that Wright had asked him (either directly or through Trooper Tamewitz) to write to the Parole Board on his behalf. PCRA Hr'g Tr., 3/30/07, at 75. On December 13, 1996, the Prosecutor sent a letter to the Chairman of the Parole Board and

15

informed him of Wright's cooperation. The Prosecutor copied Trooper Tamewitz and "blind copied" Wright on this letter. ECF No. 39-4, at 38–40. On January 2, 1997, the Chairman replied to the Prosecutor that his "letter will be incorporated into Mr. Wright's file so the Board Member or Hearing Examiner will have this information available to him at the time of the parole interview." ECF No. 39-4, at 42.

As was the case with Tribuiani's deal, there is no dispute that Prosecutor did not disclose any of this information as to the arrangement with Wright to Weiss's defense team, notwithstanding his obligations under both the state trial court's pre-trial order, and the Supreme Court's command in *Brady*.

### 3. The Prosecutor Presented and Failed to Correct False Testimony at Weiss's Capital Trial

At Weiss's preliminary hearing in March 1997, Defense Counsel asked Tribuiani (in the presence of the Prosecutor) if he had made "any deals with the prosecution in this case?" Hr'g Tr., 3/6/97, at 103. Tribuiani replied: "No." *Id.* Defense Counsel then pressed him: "None at all?" to which Tribuiani responded "No." *Id.* The evidence developed at the PCRA hearings establishes that Tribuiani's testimony at this pre-trial hearing was demonstrably false. The Prosecutor's own memorandum to his file proves that by April 8, 1996, just six days after he gave his statement to Trooper Tamewitz and nearly a full year before this testimony, Tribuiani demanded that he receive favorable consideration in exchange for his information and that the Prosecutor was going to arrange for just that. The Prosecutor and Trooper Tamewitz immediately began affirmatively providing him with the very assistance he had requested by making phone calls and writing letters on his behalf. There plainly was a mutual understanding between the Commonwealth and Tribuiani that in exchange for his information, the Prosecutor and Trooper Tamewitz would assist him in his effort to get an early release. *See* ECF 39-1 at 20–21.

16

Such an understanding is called a "deal." Tribuiani and the prosecution made one, each kept it, and then kept it secret.

Wright also had such a mutual understanding or "deal" with the Commonwealth. After he gave his statement to Trooper Tamewitz, he asked the Prosecutor for assistance in getting parole. In December 1996, the Prosecutor wrote to the Chairman of the Parole Board and sent Wright a blind copy of the letter so that Wright would know of the efforts the Prosecutor was making on his behalf. PCRA Hr'g Tr., 3/30/07, at 75–76; ECF No. 39-4, at 38–40.

Each party entered into that "deal," fulfilled their part of the "deal," and then kept it secret.

At a pre-trial hearing held on May 16, 1997, the Prosecutor told Defense Counsel *and the trial court* that "we don't have any deals with" any potential witnesses. Hr'g Tr., 5/16/97, at 9 (italics added). This statement was false. Given the presence of mind exemplified by the Prosecutor's own memo to his own file from a year before, this was plainly a lie by the Commonwealth's prosecuting attorney in a capital murder case. In his subsequent written response to the defense's discovery motion, the Prosecutor failed to reveal that both Tribuiani and Wright had asked for specific consideration from the prosecution and had received that very consideration. He also wrote that all that the Commonwealth told Tribuiani and Wright was that it "will accurately report the nature and extent of their cooperation *whenever queried regarding the same.*" ECF No. 39-3, at 87 (emphasis added). This statement was also false. The Prosecutor and Trooper Tamewitz were the ones that had initiated the contacts with the court, prison, Parole Board, and other officials on Tribuiani's and Wright's behalf.

At Weiss's trial, in response to questions posed to him by the Prosecutor, Tribuiani and Wright each testified under oath that no one had made any promises in exchange for his testimony.

17

Trial Tr., 7/8/97, at 533, 558.[13] For the reasons just discussed, their testimony on this point was false, the Prosecutor knew it was false, and so did Tribuiani and Wright. Thus, they lied, too. When Trooper Tamewitz testified, the Prosecutor asked him if he had promised Tribuiani anything in exchange for his April 2, 1996, statement. *Id.* at 564. Trooper Tamewitz said that he did not. *Id.* This testimony was false and Trooper Tamewitz and the Prosecutor knew that it was false. Within days of making his statement to Trooper Tamewitz (and months before the trial), Tribuiani had asked for and was receiving the very consideration he asked for and that the prosecution had promised.

The Prosecutor did not correct any of this false testimony given at Weiss's trial. He stood by silently as witnesses central to the prosecution's case, two convicted felons, lied under oath to a judge and a jury in a capital murder trial and as the false testimony of a Pennsylvania State Trooper backed them up.[14] And because he had suppressed the information about the understandings the Commonwealth had with Tribuiani and Wright, he deprived the defense of valuable evidence it could have used to both impeach their testimony and call into question the integrity of the Commonwealth's prosecution of this case.

---

[13] On redirect, the Prosecutor asked Wright if he requested anything in exchange for the statement he gave to *Trooper Witmer on July 11, 1995*. Trial Tr., 7/8/97, at 544. Wright replied that he did not. *Id.* Trooper Witmer likewise testified that Wright did not ask him for anything. *Id.* at 547. While their testimony on this point might have been literally true, it was deliberately misleading because both Wright and the Prosecutor knew that Wright had asked the Prosecutor for parole assistance after he gave *Trooper Tamewitz* his signed statement.

[14] At oral argument in this Court, the Commonwealth's counsel described the false testimony as "problematic," ECF No. 73, at 40, the result of direct examination by the Prosecutor at Weiss's trial that involved "tap dancing" questions and answers. *Id.* at 39. On that topic, the transcript of the Prosecutor's testimony at the PCRA hearing of March 30, 2007 demonstrates a level of testimonial evasiveness by him that in this Court's estimation goes well beyond "tap dancing."

18

## 4. The State Court's Decision

On July 31, 2007, the PCRA court issued its decision granting Weiss a new trial. It described the Commonwealth's conduct as "outrageous" and held that "[i]t is crystal clear based on credible testimony in this case that the Commonwealth violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963)." ECF No. 39-1, at 10.[15]

On appeal, the Pennsylvania Supreme Court did not disturb the PCRA court's determination that the Commonwealth suppressed *Brady* information. It remanded the case because it concluded that the PCRA court did not "address or make any explicit determination" as to whether the suppression was material. *Weiss II*, 986 A.2d at 815–16.[16] By the time the case was remanded, the original PCRA court judge had retired and it was assigned to another judge, who presided over additional hearings. After that judge's unfortunate passing, a third judge was

---

[15] At the conclusion of the Prosecutor's PCRA Hearing testimony, the first PCRA Judge, Hon. W. L. Henry, stated as follows in regard to the Prosecutor's assertion at the PCRA Hearing that while the credibility of Tribuiani and Wright was important when he put them on the stand, once Pearson and the Defendant testified, it was no longer important:

> . . . Well, I can't rest on that. You've got to be kidding. These two people took an alleged confession from the Defendant and they take the stand and you don't think their credibility is important?
> . . .
> Well, I'm going to be blunt and say I find that truly preposterous, truly preposterous that you would not think that their credibility was important. Maybe I'm missing something, but for the time being we'll etch that in stone on the record indelibly. I just can't understand that . . . .

PCRA Hr'g Tr., 3/30/17, at 116–117.

[16] In his dissent in *Weiss II*, Justice Baer explained his belief that no remand was necessary because, although the PCRA court's opinion "lacks a comprehensive discussion of the individual components of a *Brady* claim, further elaboration is unnecessary because it is self-evident that the PCRA court believed [Weiss] was prejudiced by the Commonwealth's failure to disclose evidence impeaching the two jailhouse informants." 986 A.2d at 819. In support of his conclusion, Justice Baer pointed to the October 31, 2007, findings of fact the PCRA court issued in which it described Tribuiani's and Wright's testimony as the "crux of the Commonwealth's case." *Id.* In his estimation, that finding, along with the statements the PCRA court made in its July 31, 2007, opinion, made it "clear" that the PCRA court found that Weiss had met *Brady*'s materiality element. The majority disagreed. It found that the PCRA court's determination that Tribuiani's and Wright's testimony was the "crux of the Commonwealth's case," was "not supported by the record." *Id.* at 816. "This was not a case," the majority explained, "that hinged on one or two facts or the testimony of one or two witnesses," and it faulted the PCRA court for failing to directly address "the salient inquiry of whether or not [Weiss] received a fair trial under the circumstances." *Id.* It "emphasize[d] that we express no view as to the merits of [Weiss's] *Brady* claim, but remand to the PCRA court for a meaningful analysis of the claim." *Id.*

assigned to preside over the PCRA proceeding. By this point, the Commonwealth had conceded that Weiss was entitled to a new sentencing hearing because his trial counsel failed to investigate and present available mitigating evidence. ECF No. 39-1, at 41–42.

On March 19, 2012, the PCRA court issued its decision on remand. ECF No. 39-1, at 13–46. It did not discuss Weiss's false-testimony claim. It determined once again that the Commonwealth suppressed impeachment evidence, holding that "it was absolutely the Commonwealth's duty to reveal that [Tribuiani and Wright] had alluded to a *quid pro quo* for their cooperation and that [the Prosecutor] and Trooper Tamewitz had made telephone calls and written letters on their account." ECF No. 39-1, at 20. The PCRA court concluded, however, that Weiss was not entitled to a new trial. Even if the defense had impeached Tribuiani's and Wright's testimony, the PCRA court held, the evidence that remained "was overwhelming," *id.* at 25, including Weiss's own testimony, which it found to be so preposterous that it qualified as "[t]he most damaging evidence" of his guilt. *Id.* at 22.

On October 31, 2013, the Pennsylvania Supreme Court issued *Weiss III* and affirmed. It denied Weiss's suppressed-evidence claim on the merits. It declined to consider his false-testimony claim because it erroneously determined that Weiss failed to preserve it. *Weiss III*, 81 A.3d at 785 n.11.[17]

In evaluating Weiss's suppressed-evidence claim, the only issue that the Pennsylvania Supreme Court had to decide was whether the withheld evidence was material for *Brady* purposes. Weiss argued that in conducting its analysis, the court should examine the evidence introduced at his trial independent of his own testimony because he likely would not have made the decision to

---

[17] Notwithstanding its repeated concessions to the contrary, ECF No. 42, at 18 and ECF No. 54, at 20, at oral argument here, the Commonwealth's counsel seemed to vaguely contend that *Weiss III* gave some consideration to the false testimony claim on the merits. ECF No. 73, at 41–42, 65–66. An examination of that decision reveals that it did no such thing, and did not reach the "presentation of false testimony" claim on its merits.

20

take the stand if the Prosecutor had not committed his misconduct. *Id.* at 787. The Pennsylvania

Supreme Court said that it assumed *arguendo* that Weiss's argument on this point was correct. *Id.*

at 788. As a result, it stated that it conducted its materiality analysis without consideration of either

Weiss's or Townsend's testimony, since the Commonwealth was permitted to call the latter

witness only to rebut a statement made by Weiss when he testified. *Id.*

The Pennsylvania Supreme Court then summarized the evidence that the Commonwealth

introduced in its case-in-chief and concluded that Weiss failed to demonstrate that the suppressed

evidence was material. *Id.* at 789. It held:

> After a careful review of the record and the PCRA court's conclusions, we agree
> with the court that the Commonwealth's evidence against [Weiss], independent of
> the tainted trial testimony of Mr. Wright and Mr. Tribuiani, contained adequate
> evidence of [Weiss's] guilt that there is no reasonable probability that if the
> Commonwealth had turned over the relevant impeachment evidence [Weiss] would
> not have been convicted.
>
> . . .
>
> The reliability of Mr. Wright and Mr. Tribuiani was not determinative of guilt
> because the Commonwealth presented substantial evidence of [Weiss's] guilt that
> was not undermined by the prosecution's withheld impeachment evidence as to
> these witnesses. *See Commonwealth v. Moose*, 529 Pa. 218, 602 A.2d 1265, 1272
> (1992) ("When the reliability of a witness may be determinative of guilt or
> innocence, nondisclosure of evidence affecting that witness's credibility" runs
> afoul of *Brady*'s disclosure requirement.). Even if Mr. Wright and Mr. Tribuiani
> had been fully impeached, the defense was confronted with a victim who was last
> seen alive with [Weiss], a bloody car interior with no credible non-incriminating
> explanation for the blood, a handmade quilt wrapped around the victim's body that
> matched the one that had disappeared from [Weiss's] car the evening he was in the
> car with Victim, [Weiss's] suspicious behavior after the disappearance, and his
> changing explanations. Based on the evidence presented, therefore, we hold that a
> different result was not reasonably probable with the prosecution's disclosure of
> impeachment evidence relevant to Mr. Wright and Mr. Tribuiani, and hold that
> [Weiss] still received a fair trial resulting a verdict worthy of confidence.

*Id.* at 789–90.

After the Pennsylvania Supreme Court issued *Weiss III*, the case was remanded to the state

trial court because Weiss required a new sentencing hearing. The Commonwealth ultimately

decided that it would no longer pursue a sentence of death. As a result, on June 6, 2014, Weiss was sentenced to term of life imprisonment without the possibility of parole.

## C. Weiss's Amended Federal Petition for a Writ of Habeas Corpus

After Weiss was resentenced, the stay in this case was lifted and he filed his amended petition for a writ of habeas corpus, ECF No. 39, in which he raises the same suppressed-evidence and false-testimony claims that he presented to the state courts in his PCRA proceeding.[18] The parties filed pleadings in support of their respective positions, ECF Nos. 42, 49, 54, and 58, and also submitted supplemental briefing to address the recent precedential decisions of the United States Court of Appeals for the Third Circuit in *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 281 (3d Cir. 2016) (en banc) and *Haskell v. Superintendent Greene SCI*, 866 F.3d 139 (3d Cir. 2017). ECF Nos. 64, 65, and 69. This Court also held oral argument, and the transcript of that argument is at ECF No. 73.

## II. Discussion

### A. Standard of Review

Weiss's amended petition is governed by 28 U.S.C. § 2254, which is the federal habeas statute applicable to state prisoners. This statute permits a federal court to entertain an application for habeas corpus relief from a state prisoner, in relevant part, "only on the ground that he or she is in custody in violation of the Constitution . . . of the United States." 28 U.S.C. § 2254(a). Weiss carries the burden of proving that he is entitled to the writ. *See, e.g.*, *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

---

[18] In his amended petition, Weiss raised other *Brady* subclaims, as well as three additional guilt-phase claims. This Court's determination that Weiss is entitled to the writ on the claims discussed in this Opinion renders it unnecessary for the Court to address Weiss's remaining claims and subclaims. Any relief that he could obtain on them would be cumulative.

In 1996, Congress made significant amendments to § 2254 with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403–04 (2000)). AEDPA's amendments to § 2254 apply to all federal habeas petitions filed by state prisoners after its effective date of April 24, 1996, and, therefore, they apply in this case. *Lindh v. Murphy*, 521 U.S. 320, 326–67 (1997).

Prior to AEDPA's enactment, a federal court applied a de novo standard of review to questions of law and mixed questions of law and fact.[19] AEDPA put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). In relevant part, it prohibits a federal court from granting habeas relief on "any claim *that was adjudicated on the merits* in State court proceedings unless the adjudication of the claim– (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). Because the Pennsylvania Supreme Court[20] in *Weiss III* denied Weiss's suppressed-evidence claim on the merits, AEDPA's deferential standard of review at § 2254(d)(1) applies to this Court's review of that claim.[21]

---

[19] A finding of fact made by a state court has always been afforded considerable deference in a federal habeas proceeding. AEDPA continued that deference at provisions codified at 28 U.S.C. § 2254(d)(2) and § 2254(e)(1).

[20] When applying § 2254(d), the Court considers the "last reasoned decision" of the state courts. *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008)); *Brown v. Superintendent Greene SCI*, 834 F.3d 506, 512 (3d Cir. 2016). Here, that is the Pennsylvania Supreme Court's decision in *Weiss III*.

[21] When the state court has adjudicated a claim on the merits and a petitioner challenges the factual basis of the state court's decision, AEDPA's standard of review at § 2254(d)(2) applies. It prohibits a federal court from granting habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim– . . . (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." It is not applicable here because the Pennsylvania Supreme Court's

23

That standard of review does not apply to Weiss's false-testimony claim. The Pennsylvania Supreme Court declined to adjudicate it on the merits because it determined that Weiss did not raise it properly. *Weiss III*, 81 A.3d at 785 n.11. Weiss has demonstrated that this determination was erroneous, ECF No. 49, at 24–25, and the Commonwealth has conceded that Weiss is correct on this point and it does not argue that Weiss's false-testimony claim is procedurally defaulted. ECF No. 42, at 18; ECF No. 54, at 20. Therefore, this Court must decide Weiss's false-testimony claim on its merits. Since the Pennsylvania Supreme Court did not, § 2254(d) does not apply and this Court's review is de novo. *Haskell*, 866 F.3d at 145–46 (applying de novo review to false-testimony claim when the Commonwealth expressly stated in its answer that it was not procedurally defaulted); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) ("[B]y its own terms § 2254(d) applies only to claims already 'adjudicated on the merits in State court proceedings.' It follows that when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA and explained in *Williams* do not apply.").

---

decision in *Weiss III* did not turn on any issue of fact. By the time it was considering Weiss's *Brady* claim in 2013, Weiss had proven the facts underlying his claim and the Pennsylvania Supreme Court was tasked only with determining whether the Commonwealth's suppression of impeachment evidence was material, which is a mixed question of law and fact. *Wilson v. Beard*, 589 F.3d 651, 657 n.1 (3d Cir. 2009) (observing that the parties agreed that the facts underlying the petitioner's *Brady* claim were not in dispute and, therefore, "materiality is a legal question for us to decide") (citing, *inter alia, Carter v. Rafferty*, 826 F.2d 1299, 1304 (3d Cir. 1987) ("[M]ateriality of evidence under *Brady* is a mixed question of law and fact . . . .")).

A separate provision of the federal habeas statute, § 2254(e)(1), as amended by AEDPA, provides that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." While § 2254(d)(2) only applies when a claim was "adjudicated on the merits in State court proceedings," § 2254(e)(1) does not contain that qualifying language. *Lambert v. Blackwell*, 387 F.3d 210, 235–36 (3d Cir. 2004) (discussing the interplay between §§ 2254(d)(2) and (e)(1)). The PCRA court, in both the 2007 opinion authored by the first PCRA judge assigned, and the 2012 opinion authored by the third PCRA judge assigned, made findings of fact that were favorable to Weiss.

**B. The False-Testimony Claim**

"A state violates the Fourteenth Amendment's due process guarantee when it knowingly presents or fails to correct false testimony in a criminal proceeding." *Haskell*, 866 F.3d at 145–46 (citing *Napue* and *Giglio*). As set forth above, the knowing use by the prosecution of false testimony so corrupts "the truth-seeking function of the trial process," that the more defense-friendly standard of materiality applies to such claims. *Id.* at 146 (quoting *Agurs*, 427 U.S. at 104). That is because:

> Presenting false testimony cuts to the core of a defendant's right to due process. It thus makes sense that "the materiality standard for false testimony is lower, more favorable to the defendant, and hostile to the prosecution as compared to the standard for a general *Brady* withholding violation." [*United States v. Clay*, 720 F.3d 1021, 1026 (8th Cir. 2013).]
>
> At root is how can a defendant possibly enjoy his right to a fair trial when the state is willing to present (or fails to correct) lies told by its own witness and then vouches for and relies on that witness's supposed honesty in its closing? As the Supreme Court recited in *Napue*,
>
> > [i]t is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.
>
> 360 U.S. at 269–70 [(quoting *People v. Savvides*, 136 N.E.2d 853, 854–55 (N.Y. 1956)) (internal ellipses omitted)].

866 F.3d at 152.

To prevail on his false-testimony claim, Weiss must demonstrate that (1) Tribuiani, and/or Wright, and/or Trooper Tamewitz testified falsely; (2) the Prosecutor knew or should have known that such testimony was false and did not correct it; and (3) there is *any* reasonable likelihood that the false testimony *could have* affected the judgment of the jury. *Id.* at 146 (italics added). Weiss has established each of these elements.

The Court has already explained that the record establishes that Tribuiani, Wright, and Trooper Tamewitz testified falsely at Weiss's trial.[22] They knew their testimony was false and the Prosecutor knew it was false, and yet he failed to correct it. In fact, at trial, the Prosecutor put Tribuiani on the stand knowing that he had already lied at Weiss's preliminary hearing as to the existence of his "deal." As a result, the trial jury never learned the truth: that Tribuiani and Wright had asked for consideration in exchange for their testimony (a "deal"), that the Prosecutor (and Trooper Tamewitz, in the case of Tribuiani) gave it to them by making phone calls and writing letters on their behalf, and that Tribuiani had already lied under oath in court on this very issue.[23]

This Court concludes that there is a reasonable likelihood that the false testimony could have affected the jury's verdict. Before Trooper Tamewitz obtained Tribuiani's and Wright's signed statements, the Commonwealth itself determined that it could not even seek to hold Weiss for trial, let alone convict him of first-degree capital murder. Those statements by Tribuiani and Wright provided the only direct evidence the Commonwealth introduced in its case-in-chief that Weiss murdered Ms. Bruzda. And Tribuiani provided the only evidence that attributed to Weiss a motive for the killing and described to the jury how Weiss did it. And as the United States Supreme Court has observed in regard to the evidentiary power of a confession,

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Bruton v. United States*, 391 U.S. at 139–40 (White, J., dissenting); *see also Cruz v. New York*, 481 U.S. at 195 (White, J., dissenting) (citing *Bruton*). While

---

[22] And the centrality of that testimony is amplified by the fact that it took only one (1) day to put in the prosecution's entire case. ECF No. 73, at 33.

[23] And the Pennsylvania Supreme Court took no issue in either *Weiss II* or *Weiss III* with the magnitude and reality of the Commonwealth's misrepresentations.

26

some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision.

*Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). This reality is particularly true when one confession is used to corroborate the other, as was the situation here.[24]

Before the Commonwealth made its deals with Tribuiani and Wright, it was unwilling to take Weiss to trial. It had concluded that it could not, even when state law was changed and Weiss's spouse would be permitted to testify for the Commonwealth. Their confession testimony was, therefore, obviously central to the Commonwealth's case, as demonstrated by the reality that it was what pushed the Commonwealth to charge and try Weiss, and the Commonwealth then and there knew that to be the case.

Further, this Court must consider what impact the prosecutorial misconduct had on the course of Weiss's trial. *Dennis*, 834 F.3d at 311 ("Alterations in defense preparation and cross-examination at trial are precisely the types of qualities that made evidence material under *Brady*."). For instance, if the Prosecutor had not committed his misconduct and tolerated the under-oath lies of his two "confession witnesses" and a State Trooper, and instead came clean as to the deals (and therefore as to Tribuiani's prior false testimony at the preliminary hearing), it is more than reasonably probable (if not highly likely) that Weiss would not have testified and instead pursued a defense that included the premise that Tribuiani and Wright could not be believed when they testified about jailhouse confessions occurring years before, and argued that the rest of the

---

[24] The first PCRA Judge opined, "[f]or [the Prosecutor], at the trial of this matter for the Commonwealth, to testify at the PCRA hearing in this matter that in his opinion credibility of the Commonwealth's key witnesses that identified the Defendant Ronald Lee Weiss in this matter was not nearly as important *is beyond belief.*" ECF No. 39-1, at 10–11 (emphasis added). The PCRA remand court expressed similarly strong assessments of the Prosecutor's *Brady* violations. ECF No. 39-1 at 20–21.

27

Commonwealth's evidence did not prove that he was guilty beyond a reasonable doubt. And if Weiss would not have testified, then Townsend would not have testified either. And even if Weiss would still have testified, he would have been able to utilize the suppressed evidence to challenge the credibility of the police investigation and the reliability of the Commonwealth's central evidence.[25] Under either scenario, there is at least a reasonable (and in reality a far greater) likelihood that the false testimony of Tribuiani, Wright, and Trooper Tamewitz could have affected the jury's verdict that Weiss was guilty of first-degree murder.

The long and the short of it is that if Tribuiani and Wright had not lied, and if the Prosecutor and Trooper Tamewitz told the whole truth, there simply would have been a fundamentally different trial in this case.

The Commonwealth argues that its case did not hinge entirely on Tribuiani's and Wright's testimony and that it introduced a considerable amount of circumstantial evidence to prove Weiss's guilt. But as noted above, "entirely" is not the relevant legal standard. While Pearson's testimony in particular was obviously significant and inculpatory, her testimony had its own credibility issues. She had waited many years to provide her information to the police, and there was evidence that contrary to her trial testimony, she had told Spence-Neigh at the end of October 1978 that there was only "[a] spot of blood" in the backseat of the Buick. Trial Tr., 7/8/97, at 553–54. In the same vein, Hobart equivocated on cross-examination about giving Weiss a tire iron. And critically, as late as March 1995, the Attorney General's Office had determined that, even with Pearson's testimony, it did not have enough evidence to successfully prosecute Weiss. And most importantly,

---

[25] Perhaps by the trial, the Prosecutor had concluded that he could not avoid calling Tribuiani, or could not come clean as to the deals, since Tribuiani had already testified falsely that he had no deal at Weiss's preliminary hearing. ECF No. 73, at 55–56. At that point, the Prosecutor was stuck between not calling Tribuiani as a trial witness (which would have raised its own red flag), perpetuating a lie by Tribuiani, or following the law and making the disclosures directed by the Supreme Court in *Brady* and *Kyles*.

when making the materiality inquiry as to this claim, the Court is not permitted to simply ask whether there was sufficient evidence to convict if the false testimony is discounted. *Haskell*, 866 F.3d at 145–52 (describing the materiality inquiry). Instead, it is required to ask whether "there is *any* reasonable likelihood that the false testimony *could have affected* the judgment of the jury." *Id.* at 146 (emphasis added) (quoting *Agurs*, 427 U.S. at 103). *Kyles*, 514 U.S. at 434–35. Weiss has met that standard.

In this Court's estimation, our Court of Appeals's recent decision in *Haskell* inexorably leads to this Court's conclusions in this case. In *Haskell*, as here, the state court did not rule on the petitioner's false-testimony claim, it was not defaulted, and, therefore, it was subject to de novo review in federal court. *Haskell*, 866 F.3d at 145–46. The petitioner was convicted of first-degree murder for shooting and killing an acquaintance in a crowded bar and "[t]he primary issue at the trial was whether [he] was the gunman." *Id.* at 140. The Commonwealth presented circumstantial evidence to support its case and also the testimony of four eyewitnesses who provided direct evidence that the petitioner was the shooter. *Id.* at 140–45. The jury heard evidence regarding three of the eyewitnesses that called into question the credibility of their identifications. *Id.* The fourth eyewitness had consistently identified the petitioner as the shooter. She testified that she "expect[ed] nothing in return from the Commonwealth in exchange for her testimony." *Id.* at 146. But her testimony was false, the prosecutor knew or should have known it was false, and then failed to correct it. *Id.*

Our Court of Appeals concluded that "there is little doubt" that the petitioner met the materiality standard for false-testimony claims. *Id.* at 147.

> Given [the fourth eyewitness's] central role, knowledge of the benefit she received in exchange for her testimony–substantial help with her own pending criminal charges–poses a reasonable, and significant, likelihood of affecting the judgment of the jury. *See Napue*, 360 U.S. at 270 ("Had the jury been apprised of

> the true facts . . . it might well have concluded that [the witness] had fabricated
> testimony in order to curry the favor of the very representative of the State who was
> prosecuting the case in which [she] was testifying, for [she] might have believed
> that such a representative was in a position to implement (as he ultimately attempted
> to do) any promise of consideration.").

*Id.* at 146–47 (alterations added).

The same reasoning applies to this case. Tribuiani testified that Weiss confessed to him when they were incarcerated together in 1993, but he did not report that confession to Trooper Tamewitz until April 1996, when he was being considered for early release from prison. If the jury had learned that within days of giving his statement, the Prosecutor and Trooper Tamewitz began assisting Tribuiani in getting an early release, it might well have concluded that Tribuiani fabricated his testimony to get what he wanted, especially if it also knew that Tribuiani had already lied under oath at Weiss's preliminary hearing.

As for Wright, when he first reported that Weiss had confessed to him, he was not in prison and he told Trooper Witmer that he would not "squeal." ECF No. 39-1, at 55. It was not until he was incarcerated again that he gave his statement to Trooper Tamewitz. If the jury had learned that he asked the Prosecutor to write to the Parole Board on his behalf in those circumstances, it might well have concluded that Wright fabricated his testimony once he had returned to prison in order to get a ticket back out.

Without credible testimony from Tribuiani and Wright,[26] the Commonwealth would have been back in the position it had been in prior to Weiss's 1997 arrest, with a case consisting of only the circumstantial evidence that for eighteen years did not qualify *in the Commonwealth's own judgment* as being enough to bring Weiss to trial. For the Commonwealth to now contend that the

---

[26] And the Commonwealth knew their testimony was really important, as it also sought to corroborate Tribuiani's testimony with the testimony of another witness, Drylie. *See* ECF No. 73, at 62, 66; *Weiss III*, 81 A.3d at 799–800.

testimony of Tribuiani and Wright was merely "problematic" and not material is dismissive of the constitutional obligations at issue here, since "when the state has corrupted the truth-seeking function of the trial by knowingly presenting or failing to correct perjured testimony, the threat to a defendant's right to due process is at its apex and the State's interests are at their nadir." *Haskell*, 866 F.3d at 152.

Weiss has established that the Prosecutor knowingly introduced and then condoned false testimony that had a material impact on his trial as that standard was explained in *Haskell*, and reasonably could have affected the judgment of the jury. On this basis alone, he is entitled to the writ he requests on this claim.

## C. The Suppressed-Evidence Claim

Weiss also contends that he has satisfied the materiality standard applicable to his suppressed-evidence claim. The Pennsylvania Supreme Court held otherwise. Weiss argues that although the *Weiss III* court articulated the proper materiality standard as set forth in *Kyles* and *Bagley*, its decision nonetheless amounted to an "unreasonable application" of that standard and, therefore, he has met his burden under § 2254(d)(1).[27] *Dennis*, 834 F.3d at 280 ("A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'") (quoting *Williams*, 529 U.S. at 413).

---

[27] Under § 2254(d)(1), a petitioner has the burden of showing that the state court's adjudication was either "contrary to" or "an unreasonable application of" United States Supreme Court precedent. "A state court decision is 'contrary to' clearly established federal law if the state court (1) 'applies a rule that contradicts the governing law' set forth in Supreme Court precedent or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different' from that reached by the Supreme Court." *Dennis*, 834 F.3d at 280 (quoting *Williams*, 529 U.S. at 405–06) (bracket text added by the Court of Appeals). Weiss does not argue that the Pennsylvania Supreme Court's decision in *Weiss III* was "contrary to" the relevant United States Supreme Court precedent.

31

To prevail on this argument, Weiss must do more than convince this Court that the Pennsylvania Supreme Court's decision was incorrect. *Id.* (citing *Williams*, 529 U.S. at 409). He must show its decision "was *objectively* unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409) (emphasis added by the Court of Appeals). This requires that Weiss establish that the Pennsylvania Supreme Court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

*Id.* at 102.

While this question is a closer one than that presented by his false testimony claim, the Court concludes that Weiss has satisfied this very difficult standard. Here is why.

The United States Supreme Court has made it plain that the *Brady* materiality analysis "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434 (discussing how to apply *Bagley*'s materiality analysis). It explained:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.* at 434–35.

A review of the Pennsylvania Supreme Court's adjudication in *Weiss III* shows that in actuality, it did what the United States Supreme Court instructed it not to do: it evaluated whether there remained sufficient evidence to convict Weiss if Tribuiani's and Wright's testimony had been discounted. *Weiss III*, 81 A.3d at 788–91. It denied relief because "the evidence against [Weiss] did not consist only of tainted testimony by Mr. Wright and Mr. Tribuiani," *id.* at 790, and because "the Commonwealth's evidence against [Weiss], independent of the tainted trial testimony of Mr. Wright and Mr. Tribuiani, contained adequate evidence of [Weiss's] guilt." *Id.* at 788; *see also id.* at 789 (finding no materiality "because the Commonwealth presented substantial evidence of [Weiss's] guilt that was not undermined by the prosecution's withheld impeachment evidence"); *id.* at 791 ("[W]e do not consider the record from [Weiss's] trial to be based solely on fabricated evidence or to rest solely on the testimony of a jailhouse informant.").

As it had done in *Dennis* when that case was before it, the Pennsylvania Supreme Court in *Weiss III* "ultimately applied the *Brady* materiality standard unreasonably by using sufficiency of the evidence as a touchstone." *Dennis*, 834 F.3d at 303. *Dennis* puts to bed the contention that such a "sufficiency of the evidence" review is legally proper in these circumstances. *Id.* at 304–05; *See Kyles*, 514 U.S. at 434–35 & n.8.

While a court must of course consider the strength of the state's case when it decides the *Brady* materiality of withheld evidence, it also must weigh that factor with other critical considerations, including (1) the importance of the witnesses whose testimony could have been impeached if the defense had been provided with the withheld evidence,[28] *Dennis*, 834 F.3d at

---

[28] And, the *Weiss III* court seemingly gave no consideration to the reality that the confession testimony of each Tribuiani and Wright corroborated that of the other, amplifying the centrality and impact of that testimony.

33

293–300; (2) the impact the prosecutorial misconduct had on the defense pursued, [29] *id.* at 311; and (3) how that evidence "would have raised opportunities to attack . . . the thoroughness and even the good faith of the [Commonwealth's] investigation." *Kyles*, 514 U.S. at 435; *see also Dennis*, 834 F.3d at 302 ("Counsel could also have used the information to challenge the adequacy of the police investigation.").[30] And as noted above, the analytical construct applied by the Pennsylvania Supreme Court also sidestepped the United States Supreme Court's powerful recognition of the very special evidentiary impact of confessions in a criminal trial. In the Court's estimation, that analysis, and the Commonwealth's position in this Court, also give no weight to the hard reality that when the Commonwealth itself had considered the body of evidence as it existed before it made the deals with Tribuiani and Wright (and at a point necessarily without the testimony of Weiss), *it* had concluded it was insufficient to bring Weiss to trial. This is perhaps the single most telling confirmation of the centrality and materiality of the unimpeached testimony of Tribuiani and Wright, and of the impact of the decision of Weiss to take the stand, [31] a decision logically driven by the testimony of Weiss's alleged dual confessions.

---

[29] At oral argument here, the Commonwealth argued that any defense counsel could have and therefore should have anticipated or even expected that witnesses such as Wright and Tribuiani would have received the very deals they had, apparently notwithstanding the Prosecution's disclaimer of any such thing. ECF No. 73, at 37–38. That argument boils down to an argument that the Defense Counsel here should have known that Tribuiani and Wright lied on the stand, and that the Prosecutor's denial of any deals should have been disbelieved. This position, of course, turns *Brady* on its head.

[30] To be clear, this Court concludes that the court in *Weiss III* was objectively unreasonable in its application of *Brady* and *Kyles*, because among other things its conclusion ignored the hard reality that based on the Commonwealth's decisions as to when and how to prosecute Weiss, it was the centrality of Tribuiani and Wright's testimony that made the difference, the linchpin of the concept of "materiality." And the lies told in the trial court and by the prosecution plainly would have impacted the defense strategy taken by Weiss's lawyers.

[31] A significant point of disagreement in *Weiss III* was whether the analysis of the *Brady* "suppressed evidence" claim should consider the trial testimony of Weiss and Townsend. The *Weiss III* majority affirmatively stated that it did not consider it, accepting at least for those purposes that it was unlikely that if Tribuiani and Wright were impeached, Weiss (and therefore Townsend) would have testified at all. 81 A.3d at 788. Justice Castille in his *Weiss III* Concurrence expressly disavowed that approach. 81 A.3d at 810. Post-*Dennis*, this Court is obligated to consider the materiality analysis on the same terms as did the *Weiss III* Court (that is, assuming that neither Weiss nor Townsend would have testified), *Dennis*, 834 F.3d at 283, and with a recognition that the impact of the *Brady* violation on the

34

Thus, considering the *Brady* materiality factors as explained by our Court of Appeals in *Dennis*, by any reasonable measure the false testimony of Tribuiani and Wright, and the Prosecutor's cover up of those lies, fundamentally changed the arc of Weiss's trial. These were certainly vitally important witnesses, essentially *the* "eyewitnesses" to the alleged repeated confessions of the Defendant, witnesses who had "made the case" to the degree that the Commonwealth had long been unwilling to prosecute Weiss without them. And the prosecutional misconduct plainly affected the defense strategy pursued. The cover up prevented the defense from not only impeaching Tribuiani and Wright based on their deals, but also from demonstrating that Tribuiani had already lied under oath, and by any rational measure, put Weiss in the position of having to waive his Fifth Amendment rights and to take the stand to rebut the asserted confessions.[32] And finally, particularly as to failing to expose Tribuiani's lie at the preliminary hearing, the Commonwealth's non-disclosures plainly interfered with the ability of the defense to address the good-faith of the prosecution, as it was in no position to argue to the jury that the prosecution would go to impermissible lengths, including the presentation of false sworn testimony, in order to get a conviction.

---

overall course of conduct of the trial (including as to impact on defense strategy), as opposed to a "sufficiency of the evidence" analysis, is central to the "suppressed evidence" materiality assessment. *Id.* at 293–300.

[32] While the *Weiss III* court indicated that it was disclaiming reliance on Weiss's own trial testimony and the rebuttal testimony of Townsend, at the same time also stated that it was essentially obliged to affirm that PCRA Court's remand decision if it was supported by the record and free of legal error. 81 A.3d at 788. It then observed that *the* evidence central to PCRA Court's decision on remand was the testimony of Weiss himself. *Id.* at 786-88 ("Most importantly to the PCRA court, was Appellant's own testimony, which the court characterized as the most damaging evidence the jury considered . . . "); ("The Court expressed further incredulity about [Weiss's] testimony . . . "). Thus, there would appear to be little doubt that the pivot point of the "suppressed evidence" materiality decision in the state courts was the testimony of Weiss, and that notwithstanding the *Weiss III* court's efforts to parse away the testimony of Weiss and Townsend, the decision affirmed in *Weiss III* was that Weiss had received a fair trial in a case in which the PCRA Court on remand had overwhelmingly based its conclusion on its assessment of the impact of Weiss's own testimony.

35

For all of the reasons noted above, the Court concludes that Weiss has overcome the burden imposed upon him by § 2254(d)(1) and has shown that there is a reasonable probability that, had the Prosecutor not withheld the evidence at issue in this case, the result of his trial would have been different.[33] Therefore, in addition to and distinctly from the Court's ruling on his false-testimony claim, Weiss is entitled to relief on his suppressed-evidence claim also.

### III. Conclusion

When prosecutors do secret deals, suppress evidence of them, stand by silently when the witnesses they determine to be central to their case lie about those deals, and then cover their tracks with their own false statements in and to a trial court, all in a way that plainly impacts the course and outcome of the trial, both those charged with crimes and the public are deprived of the fair trial that our Constitution commands, and to which they are entitled under the law. And this is obviously even more the case when the state seeks, and a defendant is exposed to, the ultimate penalty that our legal system may exact in a capital case. For the reasons set out above, Weiss was denied a fair trial because the Commonwealth materially "corrupted the truth-seeking function of the trial by knowingly presenting or failing to correct perjured testimony." *Haskell*, 866 F.3d at 152. But so too the citizens of the Commonwealth were denied the resolution of Ms. Bruzda's murder that a fair trial can deliver for them. The constitutional errors here were manifest,

---

[33] Of particular note is the stark reality that had Tribuiani's "deal" come out at trial, his perjury on that very topic at Weiss's preliminary hearing would have been self-evident, which goes way beyond simply being strong impeachment based on the existence of the "deal" alone. He would have been shown to be a courtroom liar. Almost in the same league is that until he went back to jail, Wright had nothing to say about Weiss because he (Wright) was not a "squealer." Then, once back in jail, and his "deal" would really matter, he was more than happy to talk about Weiss's alleged confession. The power of then impeaching him with those actions, and the timing of them, is immense. Put all of that before the jury and not only is it highly likely that Weiss's testimony is literally out of the mix, but the testimony of the two witnesses who were plainly central to the Commonwealth's decision to charge Weiss in the first instance is substantially reduced (if not eviscerated) in testimonial value. *See Dennis*, 834 F.3d. at 299–303 (discussing the particular evidentiary impact of specific impeachment evidence and its relation to the *Brady* materiality standard.)

fundamental and material, and wholly avoidable had the representatives of the Commonwealth told the truth.

Weiss has demonstrated that the Commonwealth denied him a fair trial by knowingly presenting false testimony at his trial and by concealing from the defense and the trial court the evidence that would have revealed that false testimony, evidence that plainly raised serious questions concerning Tribuiani's and Wright's motives for testifying and their credibility when they did so. Weiss did not receive a fair trial, and the result is that the outcome of that trial is unworthy of confidence. The writ of habeas corpus Weiss seeks will be conditionally granted. Within 90 days of the entry of this Court's Order, the Commonwealth may commence a new trial of Weiss. If the Commonwealth chooses not to so commence a new trial in that timeframe, it must release Weiss from the judgment of sentence he is serving in this case. *See Dennis*, 834 F.3d at 313.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: February 14, 2018

cc:     All counsel of record